**Mildred ROSSWORM, as Executrix of the Estate of Edward J. Rossworm, Deceased, Plaintiff,**

v.

**PITTSBURGH CORNING CORPORATION, Ryder Industries, Inc., The Celotex Corporation, Eagle Pitcher Industries, Inc., Keene Corporation, Johns Manville Products Corporation, Owens Corning Fiberglass Corporation, Fibreboard Corporation, Standard Asbestos Manufacturing & Insulating Company and 48 Insulations, Inc., Defendants.**

**Grace DiMURA, Administratrix of the Estate of Rocco DiMura, Deceased, Plaintiff,**

v.

**PITTSBURGH CORNING CORPORATION, Ryder Industries, Inc., The Celotex Corporation, Eagle Pitcher Industries, Inc., Keene Corporation, Johns Manville Products Corporation, Owens Corning Fiberglass Corporation, Fibreboard Corporation, Standard Asbestos Manufacturing & Insulating Company and 48 Insulations, Inc., Defendants.**

**Nos. 77–CV–184, 78–CV–22.**

United States District Court, N. D. New York.

Feb. 28, 1979.

James E. Buckley, P. C., Albany, N. Y., for plaintiffs; Thomas W. Henderson, Baskin, Boreman, Wilner, Sachs, Gondelman & Craig, Pittsburgh, Pa., Richard H. Weiner, Nolan & Heller, P. C., Jonathan P. Harvey, Albany, N. Y., of counsel.

Harvey & Harvey, Albany, N. Y., for defendant Pittsburgh Corning Corp.

Louis S. Petrone, P. C., Utica, N. Y., for defendant Ryder Industries, Inc.

Saperston, Day & Radler, P. C., Buffalo, N. Y., for defendant Fibreboard Corp.; Thomas F. Segalla, Buffalo, N. Y., of counsel.

Reid, Ochsenschlager, Murphy & Hupp, Aurora, Ill., for defendant 48 Insulations, Inc.; Dale M. Thuillez, Hesson, Ford, Sherwood & Whalen, Albany, N. Y., of counsel.

JAMES T. FOLEY, Chief Judge.

## MEMORANDUM–DECISION and ORDER

By separate motions in the above two separate actions, the Albany law firm of Harvey & Harvey, with Jonathan P. Harvey as counsel, representing defendant Pittsburgh Corning Corporation, move to disqualify the co-counsel for plaintiffs, Thomas W. Henderson, and each and every partner and associate in the Philadelphia law firm of Baskin, Boreman, Wilner, Sachs, Gondelman & Craig, on the ground of a conflict of interest. Of the above named ten defendants in the actions, three defendants: Ryder Industries, Inc., Fibreboard Corporation and 48 Insulations, Inc. have formally joined in the support of the motions. The motions were argued and submitted together, and the issue of disqualification being the same factually and legally, this single decision shall cover and decide both motions.

The complaints in the actions are essentially similar. The Rossworm complaint contains four causes of action, and the DiMura complaint has six causes of actions. The same amount of substantial compensatory and punitive damages are sought. The Rossman complaint was filed May 18, 1977, and the DiMura complaint January 13, 1978. The attorney of record in each action is Attorney James E. Buckley of Albany. Under the Baskin firm name, Thomas W. Henderson filed separate Notices of Appearance as co-counsel for the plaintiffs in the actions on May 5, 1978.

The complaints allege in their important portions that the defendants at all relevant times were engaged in the business of manufacturing, fabricating, supplying and selling products containing asbestos and asbestos filters. That the plaintiff intestate in

each action was employed for a period of several years with several different employers, and in the course of their employment were required to use and work with products which contained asbestos and asbestos fibers and dust, said products having been manufactured, fabricated, sold and supplied by the defendants. That while using said products, the asbestos fibers and dust became airborne, and were inhaled by each plaintiff intestate, causing each to contract cancer which caused great pain and suffering and their deaths.

Jurisdiction is based upon diversity of citizenship, and the causes of action are based upon breach of warranty, negligence and gross negligence principles and claims. An excellent, perceptive and exhaustive opinion in this type lawsuit, interpreting and applying the law of Texas, the forum State, and reviewing the trial, was written by Circuit Judge John Minor Wisdom in *Borel v. Fibreboard Paper Products Corporation,* 493 F.2d 1076 (5th Cir. 1973). A substantial decision followed at page 1103, denying a petition for rehearing and for an en banc consideration with further discussion of the facts developed in the trial and the law to be applied to certain facts.

Motions of this kind from their inception have been considered sensitive and important ones that affect the integrity of the Bar, the right of litigants to be represented by counsel of their own choice, and the public interest and faith in our legal system. My reading of the decision and text writing on the subject had been general and somewhat cursory, but the need for concentrated review and study was compelled by the intensity of the dispute in the voluminous submission on the motions herein.

Great interest in this type problem was created by the fact that the judicial writings, first recognized and still considered as sound and authoritative in stating the proper standards to be applied and guides to be followed in the resolution of the particular factual situation, were decisions of two eminent judges of the Second Circuit in the early years of their outstanding judicial careers. The writings and decisions were those of District Judge Edward Weinfeld in *T.C. & Theatre Corp. v. Warner Bros. Pictures,* 113 F.Supp. 265 (S.D.N.Y.1953), and then District Judge Irving R. Kaufman, now Chief Judge of the Circuit, in *United States v. Standard Oil Company,* 136 F.Supp. 345 (S.D.N.Y.1955). Both cases have been referred to in many court decisions throughout the country, and in numerous legal articles and text writings. In the *T.C. & Theatre* decision, Judge Weinfeld enunciated the "substantial relationship" test that is followed to this day. Chief Judge Kaufman in his appellate capacity in *Emle Industries, Inc. v. Patentex, Inc.,* 478 F.2d 562, at p. 570 (2d Cir. 1973), stated that the court took as its guide-post in applying Canon 4 of the ABA Code of Professional Responsibility "A lawyer should preserve the confidence and secrets of a client"—the standard articulated by Judge Weinfeld in the *T.C. Theatre* decision. Canon 9 of the ABA Code provides that "a lawyer should avoid even the appearance of professional impropriety", and major reliance is placed upon this provision by defendant Pittsburgh Corning Corporation in its quest here to disqualify Attorney Thomas W. Henderson, and every partner and associate of the Baskin firm of which he became a partner by partnership agreement of February 1, 1978.

As noted in *Silver Chrysler Plymouth, Inc. v. Chrysler Mot. Corp.,* 518 F.2d 751, 753, n. 3 (2d Cir. 1975), Judge Kaufman in *United States v. Standard Oil Company, supra,* at p. 367, while refusing to disqualify an attorney:

When dealing with ethical principles, it is apparent that we cannot paint with broad strokes. The lines are fine and must be so marked. Guide-posts can be established when virgin ground is being explored, and the conclusion in a particular case can be reached only after painstaking analysis of the facts and precise application of precedent. (emphasis supplied)

The underscored advice and approach charts the course I have followed to reach the decision of the two motions before me. I shall also now note other leading cases in

this Circuit that are worthy of consideration and also discuss standards and principles applicable to situations of this kind. *General Motors Corp. v. City of New York,* 501 F.2d 639 (2d Cir. 1974); *Hull v. Celanese,* 513 F.2d 568 (2d Cir. 1975); *Fund of Funds, Ltd. v. Arthur Andersen & Co.,* 567 F.2d 225 (2d Cir. 1977); *Government of India v. Cook Industries, Inc.,* 569 F.2d 737 (2d Cir. 1978); *Board of Education of the City of New York v. Nyquist,* 590 F.2d 1241 (2d Cir. 1979); *see also First Wis. Mortg. Trust v. First Wis. Corp.,* 584 F.2d 201 (7th Cir. 1978); *Schloetter v. Railoc of Indiana, Inc.,* 546 F.2d 706 (7th Cir. 1976); *Westinghouse Electric Corp. v. Gulf Oil Corp.,* 588 F.2d 221 (7th Cir. 1978); *Peat, Marwick, Mitchell & Co. v. Los Angeles Rams Football Co.,* 284 Md. 86, 394 A.2d 801.

The difficulty I have had in reaching one of the conclusions upon which I base my decision to deny the separate motions in the separate actions to disqualify Attorney Henderson, and his partner and associates, from representing the plaintiffs is the application in these different factual circumstances of the standard enunciated by Judge Weinfeld in this regard:

> The Court will assume that during the course of the former representation confidences were disclosed to the attorney bearing on the subject matter of the representation. *It will not inquire into their nature and extent.* Only in this manner can the lawyer's duty of absolute fidelity be enforced and the spirit of the rule relating to privileged communications be maintained.

> To compel the client to show, in addition to establishing that the subject of the present adverse representation is related to the former, the actual confidential matters previously entrusted to the attorney and their possible value to the present client would tear aside the protective cloak drawn about the lawyer-client relationship. For the Court to probe further and sift the confidences in fact revealed would require the disclosure of the very matters intended to be protected by the rule. . . . Matters disclosed by clients under the protective

seal of the attorney-client relationship and intended in their defense should not be used as weapons of offense. . . .

In cases of this sort the Court must ask whether it can reasonably be said that in the course of the former representation the attorney might have acquired information related to the subject of his subsequent representation.

*T.C. & Theatre Corp. v. Warner Bros. Pictures, supra,* 113 F.Supp. at pp. 268–269.

There is no doubt that this assumption that has been strictly and consistently followed and applied in the discussion of disqualification motions, removes or at least reduces any possibility that confidential information may be transmitted in the second representation adverse and harmful to the interests of the first client. However, if this test is made an absolute, it would eliminate in my judgment any need for the recommended painstaking analysis of the facts and even reduce adequate inquiry into the facts to decide whether "in the course of the former representation the attorney might have acquired information related to the subject of his subsequent representation." *Id.* p. 269. It is significant to note that Judge Weinfeld in his landmark decision was dealing with an antitrust case. The facts were detailed which indicated a substantial imparting of confidential information with a thorough knowledge of a company business gained from the first representation that carried over to the second representation in which disqualification was sought and granted.

We deal in these motions with cases that are basically negligence cases. In my experience, there are few, if any, unexplored avenues of factual discovery in such cases. The rules of discovery providing for depositions, interrogatories, expert report disclosure, production of documents and things, and other relevant matters, and entry upon land and other property for inspection purposes are always invoked in major negligence cases, and pressed to the fullest extent. There is little unknown about the facts or that cannot become known by discovery to both sides. For that reason, I do

not follow here with rigidity and absolutism the assumption principle of *T.C. & Theatre* to the extent that the appearance of ethical breach is irrebuttable.

I believe that the approach here of analysis of the facts to determine whether confidential information was or might be imparted to Attorney Henderson is supported by the reasoning of Judge Mansfield concurring in *Government of India v. Cook Industries, Inc.,* 569 F.2d 737 at 741:

> In some cases, even though the subject matter of the two relationships may appear to be substantially the same, the attorney may also be able to show that he gained no confidential information at all from the earlier representation. It would be unfair to preclude such a showing by clinging to an irrebuttable presumption. For this reason I believe that the district court should have the discretionary power in an appropriate case to permit the door to be opened for rebuttal of the presumption. I am confident that in such rather rare cases, the court will devise appropriate means, including use of *in camera* or other protective devices, to safeguard the interests of the former client.

This rebuttability approach in a proper factual situation, Judge Mansfield points out therein was held by the Second Circuit in *Silver Chrysler Plymouth, Inc. v. Chrysler Mot. Corp., supra,* 518 F.2d at p. 754 (2d Cir. 1975), reaffirming such holding in *Laskey Bros. of W. Va., Inc. v. Warner Bros. Pictures,* 224 F.2d 824, 827 (2d Cir. 1955), *cert. den.,* 350 U.S. 932, 76 S.Ct. 300, 100 L.Ed. 814 (1956). There are other cases to support the reasoning that rebuttability in every situation is not foreclosed. *Schloetter v. Railoc of Indiana, Inc.,* 546 F.2d 706 (7th Cir. 1976); *First Wis. Mortg. Trust v. First Wis. Corp.,* 584 F.2d 201, 211, fn. 6 (7th Cir. 1978) (also suggesting in camera examination). Second Circuit Judge Van Graafeiland cautions that disqualification motions may be used for purely strategic purposes. Lawyers' Conflict of Interest—A Judges View, 50 N.Y. State Bar Journal (103: 140–141, February 1978 Issue). Such caution would seem to indicate an examination is in order to seek the actual fact situation underlying the appearances. In my judgment, appearances should succumb to actual facts that after painstaking analysis are to the contrary, nor to my mind should appearance in itself be allowed to lead conclusively to the final determination and conclusion that affects so many interests.

The actual fact situation is turned to and shall be set forth in a narrative form. It is developed well in the main by reference to letters that are attached to the motion papers as letter Exhibits. There are also full affidavits of the two attorneys who were involved in the previous representation that gives rise to these present motions to disqualify Attorney Thomas W. Henderson, an affidavit of Attorney Buckley, the attorney of record in both cases for the plaintiffs; and several affidavits of Philip Baskin, a senior partner in the Baskin firm. In January 1977, Attorney Henderson, then with a law firm other than the Baskin firm, commenced a lawsuit in the Court of Common Pleas, Allegheny County, Pennsylvania, for Clarence Fearn and his wife, Emily, against Pittsburgh Corning Corporation and others for injuries arising from the use in his employment with several employers of the same asbestos products involved in the two lawsuits here. Harold Gondelman, a partner in the Baskin firm appeared in that action for Pittsburgh Corning Corporation, the Baskin firm being retained as it had been previously in certain cases by The Travelers Insurance Company to represent their assured defendants. The Fearn case was not prosecuted to conclusion by these two attorneys.

As previously noted, Attorney Henderson became a partner in the Baskin firm on February 1, 1978, and it seems undisputed that he withdrew from acting as plaintiffs' counsel in the Fearn case in June 1978, although a formal court order was not filed until September 1978. Harold Gondelman for the Baskin firm, representing Pittsburgh Corning in the Fearn case, under the retainer with The Travelers Insurance Company, handled the matter from January

1977 until March 1978. Although it may be irrelevant as urged by Attorney Harvey to the issues here, it is noted to complete the factual detail in the relationship of Attorneys Henderson and Gondelman in the Baskin firm that Attorney Gondelman thereafter did retire as a partner from the Baskin firm on October 13, 1978. Throughout the representation of Pittsburgh Corning as a defendant in the Fearn case, Attorney Gondelman by the retainer with Travelers dealt at times with members of the law firm of Reed, Smith, Shaw & McClay of Pittsburgh, general counsel for the Pittsburgh Corning Corporation. The affidavit of September 22, 1978, of Attorney Buckley states the Baskin firm has approximately eighty lawyers in eight different cities in five states.

From my analysis of the submission, I do not find that Attorney Gondelman in this representation in the Fearn case, as contended in the affidavit supporting the motion to disqualify, became involved in voluminous pre-trial procedures and was in the possession of "lengthy confidential manuals" prepared by the general counsel of Pittsburgh Corning Corporation for use in defense in the Fearn action and in other similar actions pending against it in courts throughout the country. The linkage is then sought to be emphasized by the statement that Attorney Henderson, counsel for the plaintiffs Fearn, had no right to see or discover the information contained in the manuals, but had joined the Baskin firm which through Attorney Gondelman had complete access to them.

From my analysis of the record presented in these motions, I find the actual involvement of Attorney Gondelman in the Fearn case quite insubstantial and limited. Everyone at the trial level realizes that trial lawyers in negligence cases often do not have the time to concentrate upon one particular case where a large firm represents a number of insurance companies until a trial date is fixed by the court and is approaching. There was only a filing by Attorney Gondelman of three documents with the State Court, one being a petition for withdrawal as defense counsel on March 22, 1978. A medical librarian and a doctor were deposed by the plaintiffs, and Attorney Gondelman did not cross-examine or submit any interrogatories for either witness. Attorney Gondelman attended part of a conference held July 27, 1977, of the defense attorneys in these cases from all over the country, but my conviction is there were few confidences gained, if any, and from the list of the topics and agenda such knowledge could be gained or was already within the expert knowledge of Attorney Henderson who had been engaged in these cases as a lead and prominent trial attorney for plaintiffs in cases of this kind since 1973. (Ex. I, Aff. of Henderson, September 13, 1978). The best evidence, I believe, of limited representation is the itemized bill for services from February 15, 1977 through December 31, 1977, rendered by Attorney Gondelman to Travelers in the total amount of $1,750.00. I also find that this situation differs from other cases with a disqualification issue because here we deal with two different individual attorneys, previously representing different sides with the only real concern being that when Attorney Henderson joined the Baskin firm, Attorney Gondelman could and would discuss with him defense strategy and confidential information, and thereby allow Henderson to anticipate defense strategy and also be able to read the manuals alleged to be confidential in their content.

However, that type of direct ethical breach is not apparent from the record. To his credit, Attorney Gondelman notified The Travelers Insurance Company immediately that it should secure other counsel to represent Pittsburgh Corning in the Fearn case "since I felt that even the appearance of a conflict should be avoided inasmuch as Tom Henderson has joined my [Baskin] firm." (Ex. K). On March 15, 1978, he informed Attorney Restivo of the Reed firm, general counsel for Pittsburgh Corning, that he would not discuss any matter or information gained in the Fearn case with Henderson, and would strip the file bare and turn over all defense files to the new counsel to be retained by Travelers Insur-

ance Company. (Ex. M). The Examiner for the insurance company accepted this assurance of Attorney Gondelman with expression of trust in him, but did by letter request reassurance to such effect from Senior Partner Philip Baskin. (Ex. N). This assurance was given by letter of Philip Baskin on March 29, 1978 (Ex. O), that begins with this statement:

> It is really superfluous to ask anyone to reassure you about anything that Mr. Gondelman represented because no person's affidavit would be any more valuable than Mr. Gondelman's word.

I accept to the same degree the full and clear affidavits of Attorneys Henderson and Gondelman that they never discussed any information gained from the Gondelman participation as defense counsel for Pittsburgh Corning or that Attorney Henderson ever saw any of the material in the three manuals. I requested Attorney Harvey, after a preliminary review of the motion papers, to deliver the manuals to my Chambers, which was done on December 21, 1978, and although voluminous, there is nothing evident to me from careful reading of a confidential nature that is not in the public domain or subject to production upon discovery procedures. A reading of Judge Wisdom's decision in *Borel* covers much of the scientific and government reports concerning asbestosis. My inspection of the voluminous manuals was "in camera", the suggested approach by Judge Mansfield, and, of course, by that method there is no disclosure of the contents to anyone that might be harmful to the defense interests. The volumes shall be returned directly to Attorney Harvey.

On the question of the appearance of confidential information obtained and being imparted by an attorney in a confidential position, the practical answer and consideration is that Attorney Henderson is an attorney with a specialized knowledge gained from substantial experience in important cases of a similar nature. He was in the *Borel* case, and appears as co-counsel in eleven different courts in many of these cases, fifty percent (50%) of them involving Pittsburgh Corning as defendant and in-

sured by Travelers. Since the Spring of 1976, he has functioned as Chairman of an informal group of plaintiffs attorneys engaged in these asbestos cases. For this reason, it is just common sense to accept his sworn statement that he never discussed any aspect of these litigations, and never had any access to the three volumes, because it is evident from a cold, analytical point of view that there was no reason at all for him to be so tempted. As Justice Douglas said, common sense often makes good law. *Peak v. United States*, 353 U.S. 43, 46, 77 S.Ct. 613, 1 L.Ed.2d 631 (1957).

Very important is the right of the plaintiffs to keep and not be deprived of the services of an exceptionally qualified and experienced lawyer in the preparation and trial of their cases. It is an element in these situations that the cases continually emphasize as one that must be carefully considered. It is true in most situations, of course, that Attorney Henderson is not the only member of the Bar qualified to represent plaintiffs because in the negligence field there are many competent lawyers throughout the Nation, but at least the right of the plaintiffs and their local counsel to retain him should not be interfered with unless identifiable impropriety is shown to exist. I do not find it exists here in fact. The appearance of any impropriety would be found non-existent in a public appraisal of the situation.

Finally, with no lack of confidence in the above findings and conclusions that there was not nor would there be any transmittal of confidential information from the Attorneys Henderson and Gondelman relationship, and no appearance of impropriety, in violation of ABA Canons 4 and 9, if necessary, I would further find and conclude there was express waiver of any objection to the relationship. As described by the plaintiffs in their briefing, the agents and representatives of The Travelers Insurance Company are not to be considered unknowledgeable or amateurish in the litigation process, and can fairly be characterized as professional litigators and overseers because ordinarily they supervise to a great

degree the conduct of the defense in the suit, and because of their experience make the important decisions concerning it. This is rightly so because usually in these situations it is the money of the insurance company that is at stake.

There was never any objection to the new partnership relationship of Henderson and Gondelman in the Fearn case by the representatives of the Insurance Company or the general counsel for the assured, Pittsburgh Corning, and there does not seem to be any to this day. Both were immediately notified by Gondelman that Henderson had become a partner in the Baskin firm. (Exs. K, L & M). The detailed letter of Examiner Clark of Travelers of March 22, 1978, with reference to the "Our Insured Pittsburgh Corning Corporation," to Senior Partner Philip Baskin has important portions evidencing consciousness of the impact of the new relationship and attesting again to the trust from past experience in the integrity of Gondelman.

> I am certain that you can understand both my concern as well as Pittsburgh Corning Corporation's about having a plaintiff's attorney like Mr. Henderson who has been actively involved in asbestosis litigation cases nationwide being in a position to discuss information which may have been present in Pittsburgh Corning Corporation's file. I have been assured by Mr. Gondelman that none of this information has or will be disseminated to Mr. Henderson and I trust him on that assurance based upon my previous good dealing with him. However, I would appreciate a letter from you as senior member of your firm giving me your assurance that Mr. Henderson will not have access to *any* information contained in Mr. Gondelman's file on behalf of Pittsburgh Corning Corporation, nor will there be any discussions between Mr. Gondelman or Mr. Henderson which could present a conflict of interest regarding this case.
>
> As I indicated above, I have been completely satisfied with Mr. Gondelman's handling of this matter and of his assurance that he will not divulge any information from his file, but I do wish to have your reassurance also.

From this factual situation, I find there was express waiver and consent given to the continuance of the Henderson-Gondelman relationship in the Fearn case, and implied consent for Henderson to continue the representation of plaintiffs in these two actions filed in this Court as he had represented other plaintiffs in the past in other courts in similar actions against Pittsburgh Corning Corporation as a defendant and Travelers as the insurer. Such waiver and consent is allowed by DR 5–105(C) of the Code of Professional Responsibility, and the law is settled and persuasive in that regard. *See In Re Yarn Processing Patent Validity Litigation*, 530 F.2d 83, 89–90 (5th Cir. 1976); *see also Kagel v. First Commonwealth Co., Inc.*, 534 F.2d 194 (9th Cir. 1976); *City of Cleveland v. Cleveland Elec. Illuminating Co.*, 440 F.Supp. 193, 205 (N.D. Ohio, 1976); *aff'd* 573 F.2d 1310 (6th Cir. 1977).

My findings of fact are set forth above as required by Fed.R.Civ.Pro. 52(a), and my conclusion is that the defendant Pittsburgh Corning Corporation has not met the high standard of proof necessary to grant the separate motions to disqualify Attorney Henderson from continuing as co-counsel in these separate actions. *Government of India v. Cook Industries, Inc., supra*, 569 F.2d at pp. 738–739. Violations are not proven of ABA Canons 4 and 9, and if so existent, any violations were waived and consented to after full disclosure.

The separate motions for these foregoing reasons are denied and dismissed.

It is so Ordered.