BRITISH AIRWAYS, PLC, Plaintiff,

v.

The PORT AUTHORITY OF NEW YORK AND NEW JERSEY, Defendant.

No. CV-92-4640.

United States District Court, E.D. New York.

Sept. 14, 1994.

---

Stephen J. Fearon, Condon & Forsyth, New York City, for plaintiff.

Kathleen M. Collins, The Port Authority of New York and New Jersey, New York City, for defendant.

## MEMORANDUM AND ORDER

GLASSER, District Judge.

This is a motion by defendant The Port Authority of New York and New Jersey (the "Port Authority") to disqualify the attorney of record for plaintiff British Airways, PLC ("British Airways"), pursuant to Federal Rule of Civil Procedure 7(b)(1). For the

following reasons defendant's motion should be granted.

## FACTS

### A. *The Present Action*

This is an action by British Airways to recover damages to one of its aircraft, allegedly due to the negligence of the Port Authority, an entity responsible for the care and maintenance of taxiways at John F. Kennedy International Airport ("JFK") in New York City. The complaint alleges that on or about 9:00 p.m. on March 1, 1992, the engine of a British Airways' aircraft was damaged because the defendant allegedly "negligently, carelessly, and/or recklessly failed to maintain" a certain taxiway at JFK. Complaint, ¶ 26. The complaint sets forth two causes of action and seeks four million dollars in damages. Affidavit of Keith E. Harris, April 27, 1994 ("Harris Aff'd"), Ex. A.

Plaintiff British Airways is represented in this action by the firm of Condon & Forsyth which filed a notice of claim on its behalf on or about May 6, 1992. Affidavit of Stephen J. Fearon, June 10, 1994 ("Fearon Aff'd), ¶ 15, Ex. E. The complaint was filed on or about September 30, 1992. The Port Authority, which is representing itself via its own in-house counsel, answered the complaint on or about December 4, 1992, and asserted two affirmative defenses, two counterclaims and seeks approximately $22,000 from plaintiff in damages allegedly caused by plaintiff's breach of certain agreements between British Airways and the Port Authority. Harris Aff'd, Ex. B.

On or about March 11, 1994, the Port Authority served a third-party complaint against third-party defendant The United States of America by and through the Department of Transportation and the Federal Aviation Administration (the "United States"). Harris Aff'd, Ex. D. In short, the Port Authority alleges that any damage to the British Airways' aircraft on March 1, 1992, which was not caused by plaintiff's own culpable conduct, was due to the negligence of the third-party defendant due to its allegedly negligent performance in operating the Air Traffic Control Tower. Third–Party Complaint, ¶ 13. The United States answered the third-party complaint on or about May 11, 1994.[1]

Discovery in this action has included the following: two sets of interrogatories and requests for the production of documents have been served on the Port Authority by British Airways; The Port Authority has served two sets of interrogatories and requests for the production of documents on British Airways; the Port Authority has noticed fourteen depositions; the discovery requests have been responded to; to date, four employees of British Airways have been deposed; and British Airways produced an Incident Report and Extended Delay Worksheet regarding the March 1, 1992 incident. Condon & Forsyth has been preparing for the case via investigations and has made at least one trip to the United Kingdom and both parties have appeared at status conferences before Magistrate Judge John L. Caden. *See* Fearon Aff'd, ¶¶ 15–51.

### B. *Condon & Forsyth's Concurrent Representation of the Port Authority*

The firm of Condon & Forsyth also represents the Port Authority in a number of personal injury actions, all of which are ongoing. Condon & Forsyth represents the Port Authority in these actions because of certain lease agreements airlines such as British Airways have with the Port Authority by which the airlines agree to represent and indemnify the Port Authority "when a person is injured at JFK in an area within the airline's respective leaseholds." Fearon Aff'd, ¶ 3.[2]

Port Authority reports that, at present, the firm of Condon & Forsyth represents the Port Authority as outside counsel on at least eight personal injury cases involving JFK.

---

[1]. The United States informed the court orally that it is taking no position on defendant's motion to disqualify plaintiff's attorney and hence has not submitted any papers in connection with this motion.

[2]. These lease/indemnification agreements were not made part of the record.

Affidavit of Peter M. Doran, April 27, 1994 ("Doran Aff'd"), ¶¶ 4–5. For its part, Condon & Forsyth reports that since 1991 alone, Condon & Forsyth has represented both British Airways and the Port Authority in six actions pursuant to the lease/indemnification agreement between British Airways and the Port Authority. Fearon Aff'd, ¶ 12.[3]

It is undisputed that, pursuant to the lease agreement, the Port Authority is not billed for the firm's services. While British Airways contends that the Port Authority is not responsible for the satisfaction of any judgment or settlement which may be entered in these actions, the Port Authority states that "there are situations where the Port Authority may be held directly liable," Def.'s Reply Mem. at 4, if, for example, it is discovered that the accident did not occur in an area leased to the airline. British Airways also contends that the Port Authority does not "direct" these litigations and that the firm maintains no private communications with the Port Authority in these personal injury actions. *See* Fearon Aff'd, ¶¶ 4–7. It is also undisputed, however, that the Port Authority retains the right to review papers to be filed on its behalf by Condon & Forsyth. *See, e.g.,* Doran Aff'd, Ex. 2 (letter of March 16, 1994, from Stephen J. Fearon of Condon & Forsyth to the Port Authority requesting comments on papers to be submitted in support of defendants' motion for summary judgment in *Cohen v. The Port Authority, et al.,* No. 92 Civ. 2684 (CSH)). *See also* Fearon Aff'd, Ex. D (December 4, 1992 facsimile from Condon & Forsyth to the Port Authority attaching a draft answer for its review in *Meyers v. The Port Authority, et al.*).

\* \* \* \* \* \*

At the end of 1993, the Port Authority "discovered" that Condon & Forsyth was representing the Port Authority in these personal injury actions, Harris Aff'd, ¶ 10, and sent the firm a letter on December 30, 1993, informing the firm of the conflict and stating that "the General Counsel for the Port Authority is not in a position to waive such

conflicts and will not do so." Harris Aff'd, Ex. F. There is no written response in the record from Condon & Forsyth to this letter. Three months later, on March 28, 1994, at a conference before Magistrate Judge Caden, the court instructed the Port Authority to make a motion to disqualify Condon & Forsyth within thirty days. This motion followed.

The Port Authority contends that because Condon & Forsyth is presently representing the Port Authority in other on-going actions, a "per se" rule of disqualification should be applied in this action since, as a general rule, the courts disfavor lawyers suing their own clients without the client's consent. British Airways, however, essentially makes three arguments in opposition to the motion: (1) because Condon & Forsyth only represents the Port Authority in the personal injury actions pursuant to the lease/indemnification agreement discussed above, the Port Authority is a vicarious, or attenuated client, and hence a less stringent "substantial relationship" test should be applied and, because there is no connection between the personal injury actions and the property damage action before the court, disqualification would be inappropriate; (2) even if the "per se" rule is adopted, British Airways has met its "heavy burden" of establishing that the trial of this action would not be tainted if Condon & Forsyth remained as its counsel, thus obviating the need for disqualification; and (3) even if it is improper for Condon & Forsyth to sue its own client in an ongoing unrelated action without the client's consent, the Port Authority has waived any conflict and has impliedly consented to British Airway's choice of counsel due to its silence regarding any alleged conflict prior to its December 30, 1993 letter, and this motion.

## DISCUSSION

### I. *The "Per Se" Rule of Disqualification*

■ Any discussion of the potential disqualification of counsel in a civil action in this circuit must begin with *Cinema 5, Ltd. v.*

---

**3.** Condon & Forsyth also states that because of its long-standing representation of British Airways, and because of the lease/indemnification agreement between British Airways and the Port

Authority, it has represented both parties in numerous actions throughout the years. Fearon Aff'd, ¶ 11.

*Cinerama, Inc.*, 528 F.2d 1384 (2d Cir.1976). In *Cinema 5*, two actions were proceeding simultaneously against Cinerama, Inc. ("Cinerama"), a distributor of motion pictures and the operator of several large theater chains. In one action, Cinerama was the defendant in a federal antitrust suit in Buffalo and was represented by the Buffalo firm of Jaeckle, Fleischmann and Mangel. In the second action, brought in federal court in New York City, the plaintiff alleged that Cinerama was part of a conspiracy to acquire control of the plaintiff corporation through stock acquisitions, with the intention of creating a monopoly and restraining competition in New York City's motion picture theater market. In the New York action, the plaintiff was represented by the New York firm of Webster, Sheffield, Fleischmann, Hitchcock and Brookfield. An attorney, Manly Fleischmann, was a partner in both firms and divided his time between New York City and Buffalo. The district court in the New York action disqualified the plaintiff's counsel and the plaintiff appealed; the Second Circuit affirmed.

The Second Circuit rejected the plaintiff's argument that the district court should have used the "substantial relationship" test by which a court looks to see if there is a substantial relationship between the two actions in order to determine if disqualification is appropriate. "The 'substantial relationship' test is indeed the one that we have customarily applied in determining whether a lawyer may accept employment against a *former* client." *Id.* at 1386 (emphasis added). As in the case before this court, however, the Second Circuit noted that the situation involved an existing client, not a past client, and hence the "substantial relationship" test was not appropriate: "The propriety of this conduct [one firm in which an attorney is a partner is suing an actively represented client of another firm in which the same attorney is a partner] must be measured not so much against the similarities in litigation, as against the duty of undivided loyalty

which an attorney owes to each of his clients." *Id.*

Using the ethical yardstick of "undivided loyalty," the court held that Ethical Considerations 5–1 and 5–14 of the American Bar Association's Code of Professional Responsibility required that the plaintiff's attorney must be disqualified.[4] The court wrote:

Under the Code, the lawyer who would sue his own client, asserting in justification the lack of "substantial relationship" between the litigation and the work he has undertaken to perform for that client, is leaning on a slender reed indeed. *Putting it as mildly as we can, we think it would be questionable conduct for an attorney to participate in any lawsuit against his own client without the knowledge and consent of all concerned.*

*Id.* (emphasis added).

In rejecting the use of the "substantial relationship" test, the court held that "[w]here the relationship is a continuing one, adverse representation is prima facie improper ... and the attorney must be prepared to show [absent consent], at the very least, that there will be no actual or *apparent* conflict in loyalties or diminution in the vigor of his representation." *Id.* at 1387 (emphasis in original) (citation omitted). Although the court noted that "[w]hether such adverse representation, without more, requires disqualification in every case, is a matter we need not now decide," *id.*, it held that plaintiff's counsel had failed to meet the burden noted above and hence the disqualification order was affirmed.

Based on the analysis and holding of *Cinema 5*, courts in this circuit apply the "per se" or "prima facie" rule to disqualification motions when the attorney whose disqualification is sought is actively suing his client in other related, or non-related actions. *See, e.g., Guthrie Aircraft, Inc. v. Genesee County*, 597 F.Supp. 1097, 1098 (W.D.N.Y.1984) (where plaintiff's counsel in federal antitrust

---

**4.** Ethical Consideration 5–1 provides that "[t]he professional judgment of a lawyer should be exercised, within the bounds of the law, solely for the benefit of his client and free of compromising influences and loyalties." Ethical Consideration 5–14 provides that "[m]aintaining the indepen-

dence of professional judgment required of a lawyer precludes his acceptance or continuation of employment that will adversely affect his judgment on behalf of or dilute his loyalty to a client."

action also represents defendant in state tort action, plaintiff's attorney is disqualified because "[t]his sort of adverse representation of a current client has been held to be *prima facie* improper by the United States Court of Appeals for the Second Circuit.") (citing *Cinema 5* ). *See also Chemical Bank v. Affiliated FM Ins. Co.*, No. 87 Civ. 0150, 1994 WL 141951 at *10 (S.D.N.Y. April 20, 1994) (explaining that the "per se" rule pertains to situations involving the continuous, simultaneous representation of "traditional" clients); *Hartford Acc. and Indem. Co. v. RJR Nabisco, Inc.*, 721 F.Supp. 534, 538 (S.D.N.Y.1989) ("If a firm represents a client in the traditional sense, and if that relationship is a continuing one, then a strict rule governs that firm's ability to represent another client in a suit against the original client."); *Funds of Funds, Ltd. v. Arthur Andersen & Co.*, 435 F.Supp. 84, 95 (S.D.N.Y.1977) (because defendant was an existing client of plaintiff's attorney at the time of the investigation and filing of the instant complaint when the conflict of interest arose, the court "finds that [the defendant] should be considered an existing client for purposes of this motion and that the standard by which to evaluate [plaintiff's attorney's] conduct is that set forth in *Cinema 5*."), *aff'd in part rev'd in part on other grounds*, 567 F.2d 225 (2d Cir.1977).

In this action, Condon & Forsyth represents both the plaintiff in this federal property damage action and the defendant in a number of state personal injury actions. Therefore, if this court determines that the Port Authority is a client of Condon & Forsyth's in the "traditional" sense, the per se or prima facie rule applies and Condon & Forsyth will bear a heavy burden of establishing that "there will be no actual or *apparent* conflict in loyalties or diminution in the vigor of [its] representation." *Cinema 5*, 528 F.2d at 1387 (emphasis in original).

## II. *The Non–Traditional or Vicarious Client*

In *Glueck v. Jonathan Logan, Inc.*, 653 F.2d 746 (2d Cir.1981), the Second Circuit had before it a case in which the plaintiff sued his former employer for breach of an employment contract. The defendant corporation had a division which was a member of a 100 member not-for-profit incorporated trade association. The plaintiff's attorney was also the attorney for the association and as such he was responsible for assisting the association in negotiating multi-employer collective bargaining agreements on behalf of its members. In affirming the district court's order of disqualification, the court wrote that,

> We share Judge Conner's view that the issue is not whether Phillips Nizer's relationship to [the defendant] is in all respects that of attorney and client, but whether there exist sufficient aspects of an attorney-client relationship "for purposes of triggering inquiry into the potential conflict involved in Phillips Nizer's role as plaintiff's counsel in this action."

*Id.* at 748–49 (footnote omitted). The district court had used the strict standard of the per se or prima facie rule of disqualification found in *Cinema 5*. The Court of Appeals, however, reached the same result using a different analysis:

> We do not believe the strict standards of *Cinema 5* are inevitably invoked whenever a law firm brings suit against a member of an association that the firm represents.... *That burden is properly imposed when a lawyer undertakes to represent two adverse parties, both of which are his clients in the traditional sense. But when an adverse party is only a vicarious client by virtue of membership in an association, the risks against which Canon 5 guards will not inevitably arise.*

*Id.* at 749 (emphasis in original).[5]

The court held that the "substantial relationship" test should be used,

> in determining when Canon 5 should be applied to suits brought by an association's law firm against an association member. Disqualification will ordinarily be required whenever the subject matter of a suit is sufficiently related to the scope of the mat-

**5.** Canon 5 provides that "[a] lawyer should exercise independent professional judgment on be-

half of a client."

ters on which a firm represents an association as to create a realistic risk either that the plaintiff will not be represented with vigor or that unfair advantage will be taken of the defendant.

*Id.* at 749–50. Applying these criteria, the court held that because of the similarity between representing the association in negotiating collective bargaining agreements and representing a plaintiff suing a member of that association for a breach of an employment contract, there was a risk that (i) the issue of whether there was cause to terminate may arise in the collective bargaining discussions; and (ii) in preparing for the collective bargaining discussions, plaintiff's attorney might have learned of the defendant corporation's past practices bearing on the subject of the plaintiff's termination. Because of these risks there was a substantial relationship between the two matters (the collective bargaining representation and the termination suit), and "[b]ecause of that relationship, the strict standards of *Cinema 5* apply, and we agree with Judge Conner that appellant has not sustained the heavy burden of demonstrating that, under those standards, disqualification can be avoided." *Id.* at 750 (footnote omitted).

Based on the analysis and holding of *Glueck,* courts in this circuit will apply the "substantial relationship" test, and will shun the per se or prima facie standard, when the client seeking disqualification is only a "vicarious" client. As just noted, the Court of Appeals in *Glueck* determined that the relationship between a division of a member of an association and the association's attorney is a vicarious, attenuated or non-traditional attorney/client relationship. In *Chemical Bank v. Affiliated FM Ins. Co.,* No. 87 Civ. 0150, 1994 WL 141951 (S.D.N.Y. April 20, 1994), upon which British Airways places great reliance, the court reached a similar decision.

In *Chemical Bank,* the firm of Podvey, Sachs, Meanor, Catenacci, Hildner & Cocoziello ("Podvey Sachs") represented both the defendant in the action (nine related lawsuits to obtain payment of claims pursuant to certain insurance policies), and a group of "corporate holders" who had entered into partic-

ipation agreements with the Mutual Benefit Life Insurance Company ("MBL") and who were involved in a "rehabilitation" proceeding against MBL. The plaintiff in the action before the court (Chemical Bank) was one such corporate holder and it therefore sought disqualification of Podvey Sachs. Conceding that there were differences between the trade association in *Glueck* and the corporate holders group of which Chemical Bank was a member, the court in *Chemical Bank* nevertheless applied the less-stringent "substantial relationship" test because "there are also significant differences between Podvey Sachs' representation of [the corporate holders group] and the 'traditional' attorney-client relationship to which the per se test applies." *Id.* at *18. The court noted that Podvey Sachs did not bill Chemical Bank directly; none of the court papers filed in the rehabilitation matter against MBL identified Chemical Bank or the other individual holders; the rehabilitation action was directed for the most part by a steering committee of which Chemical Bank was not a member; the private communications between Podvey Sachs and Chemical Bank were limited in number; and the bulk of the firm's contact with the plaintiff was ministerial in nature. *Id.*

### III. *Application To This Motion*

In this action, British Airways contends that, for a variety of reasons, this court should conclude that the relationship between Condon & Forsyth and the Port Authority is, as in *Chemical Bank* and *Glueck,* an attenuated, vicarious, or "non-traditional" attorney-client relationship. That contention is not persuasive. The major difference between the situations in those actions and the situation before the court is this: In *Chemical Bank* and *Glueck* the party seeking disqualification was a *member* of an *association* of corporations, and the attorney whose disqualification was sought was the attorney for that association. By contrast, the Port Authority is not a member of an association for which Condon & Forsyth is the attorney, but rather is the *direct* client of the firm. Therefore, the risks against which Canon 5 guards (failure to exercise independent professional judgment on behalf of a client) are present

here where there is no intermediary between the attorney and the client. These risks do not arise in situations found in *Chemical Bank* and *Glueck*, where the adverse party is only a vicarious client by virtue of membership in an association and there is an intermediary between the client and the attorney. *Glueck*, 653 F.2d at 749.

The circumstances presented in *United States v. Nabisco, Inc.*, 117 F.R.D. 40 (E.D.N.Y.1987), are more akin to this case. In *Nabisco*, a law firm represented Sag Harbor Industries, Inc., one of two defendants in an action brought by the Environmental Protection Agency pursuant to the Comprehensive Environmental Response, Compensation and Liability Act of 1980. The other defendant, Nabisco, Inc. ("Nabisco") had merged with Standard Brands Incorporated ("Standard Brands") which had also been represented by Sag Harbor's counsel in five unrelated breach of contract actions. The court held that the relationship between the law firm and Nabisco was neither attenuated nor vicarious because, as in this case, "there is no intermediary entity juxtaposed between Nabisco and [the firm]." *Id.* at 45. The court rejected the analogy to the association in *Glueck* because in *Glueck* the corporate defendant had no relationship to the law firm independent of its division's membership in the association. In *Nabisco*, on the other hand, there was a direct relationship between the attorney whose disqualification was sought and the party seeking the disqualification. The same is true in this action: It is uncontroverted, for example, that Condon & Forsyth sends draft submissions to the Port Authority for its approval prior to filing them with the court. Regardless of how Condon & Forsyth came to represent the Port Authority, there is a direct relationship between the two entities. Although it may be true that the interests of the airlines and the Port Authority in these personal injury actions will often be the same,[6] it is still the case that the Port Authority retains the right to veto or alter any documents submitted on its behalf and, therefore, as in *Nabisco*, there is a direct relationship between the two and hence obedience to the more deferential

"substantial relationship" test would be error.

The court in *Nabisco* also distinguished the situation from that found in *Glueck* because in the unrelated breach of contract action in which the firm represented Nabisco's predecessor, Standard Brands, the firm only represented the interests of its successor Nabisco, "whereas the law firm in the *Glueck* case was charged with the representation of each of the 100 corporate members that comprised the ranks of the association." *Id.* at 46. In this case, in the unrelated personal injury actions, Condon & Forsyth represents the interests of the Port Authority and the airline—it does not represent hundreds of other entities who comprise the ranks of an association. Furthermore, as the court in *Nabisco* noted, "the apparent conflict is not abrogated by the dissimilarities between the subject matter of the instant action and the [breach of contract] case." *Id.* (citing *Cinema 5*, 528 F.2d at 1386). Similarly, the dissimilarities between the state personal injury actions and the federal property damage cause of action in this case do not abrogate the conflict of interests inherent in a lawyer suing his or her own client.

The court is cognizant of the fact that certain of the factors outlined in *Chemical Bank*—where disqualification was found unnecessary—are also true in the relationship between the Port Authority and Condon & Forsyth, such as the fact that the firm does not bill the party seeking disqualification directly. However, it is also the case that, unlike the situation in *Chemical Bank*, the papers filed by Condon & Forsyth in the unrelated personal injury actions *do* identify the co-defendant the Port Authority as its client, and it is also not an entirely accurate characterization to say that the Port Authority only deals with the firm on "ministerial matters," Fearon Aff'd, ¶ 8, when it is asked to review and approve papers submitted on its behalf. Furthermore, the factors outlined by the court in *Chemical Bank* were noted in the context of a situation which bore a similarity to that in *Glueck; i.e.,* the firm whose

6. Although, as pointed out above, these interests will diverge if it is discovered that the personal injury plaintiff was not injured on property leased by the airlines.

disqualification was sought represented an association or group of corporations of which the plaintiff was a member. As noted above, that is not the situation before this court.

Finally, if there was any doubt as to the relationship between the Port Authority and Condon & Forsyth based on the parties' submissions, those doubts were put to rest at oral argument. During oral argument, Condon & Forsyth conceded that nothing in the lease/indemnification agreement obligates the Port Authority to accept the firm as its counsel in the personal injury actions. The Port Authority is therefore free to refuse representation by Condon & Forsyth and is also free to instruct Condon & Forsyth as to which affirmative defenses should or should not be asserted in the personal injury actions. These facts convincingly establish that the Port Authority is a traditional, non-vicarious client of Condon & Forsyth.

In sum, I believe that it is of no legal significance that Condon & Forsyth was retained pursuant to a lease/indemnification agreement with the airlines and that, as a general matter, the airlines are the primary or lead clients in the unrelated personal injury actions. The Port Authority is the firm's client in these actions and as such it is as deserving of the "undivided loyalty" due it pursuant to the Code of Professional Responsibility as are the airlines. The firm represents both the airlines and the Port Authority directly and therefore both parties are traditional, non-vicarious, non-attenuated and direct clients.

## A. Application of the Per Se Standard

■ Having determined that the per se or prima facie standard is applicable due to the fact that Condon & Forsyth is suing a current "traditional" client, it bears the burden of demonstrating that "there will be no actual or *apparent* conflict in loyalties or diminution in the vigor of [its] representation." *Cinema*

5, 528 F.2d at 1387 (emphasis in original). The nonmoving party in *Cinema 5* failed to carry that burden. However, simultaneous adverse representation does not require disqualification in every case. *See, e.g., Board of Ed. of City of New York City v. Nyquist*, 590 F.2d 1241 (2d Cir.1979) (general counsel for union need not be disqualified even though he represents a group of male union members in litigation against a group of female union members). Although the court in *Nyquist* did not discuss the application of the "per se" test, it noted the following factors in finding disqualification inappropriate: (i) there was no claim that the attorney felt any loyalty to the female union members which would undermine his representation of the male union members; (ii) there was no evidence that his representation of the male members was anything less than vigorous; and (iii) there was no claim that the males gained an unfair advantage through access to privileged information concerning the female members. *Id.* at 1247. Rejecting the notion that an attorney can be disqualified merely on the "appearance of impropriety," [7] the court determined that because there was no possibility of tainting the trial due to the attorney's position as lawyer for the union, disqualification was not appropriate. *Id.*[8]

In support of its contention that it has met its burden in this case, British Airways argues that, as in *Nyquist*, there is no possibility that it has gained any confidential information from the Port Authority in the course of its representation of that entity in the unrelated personal injury actions which it could use against the Port Authority in this action. In this regard it relies on those cases where the courts refuse to disqualify the attorney of a *former* client if there is no indication that the attorney gained confidential information from that former client which can now be used against him in a substantially similar cause of action. *E.g., Allegaert v.*

---

7. Canon 9 provides that "[a] lawyer should avoid even the appearance of professional impropriety."

8. The court in *Chemical Bank* also held that even if it had used the per se test, it would have reached the same conclusion because, in the court's opinion, the firm's "wholly innocuous and short-lived representation of Chemical's in-

terest in the [rehabilitation] proceedings does not require disqualification...." *Chemical Bank*, 1994 WL 141951 at *19. In contrast, it cannot be said that Condon & Forsyth's representation of the Port Authority in the unrelated state personal injury actions is "wholly innocuous and short-lived."

*Perot,* 565 F.2d 246, 250 (2d Cir.1977) ("an attorney may be disqualified pursuant to Canon 4 if he has accepted employment adverse to the interests of a former client on a matter substantially related to the prior litigation.").[9] These cases are inapposite because, as British Airways concedes, the Port Authority is not a former client of Condon & Forsyth.

However, British Airways also asserts that pursuant to the lease/indemnification agreement between it and the Port Authority, Condon & Forsyth has represented both parties in a number of personal injury actions, and hence any documents or confidential information given by the Port Authority to Condon & Forsyth must have been given with the understanding that it would be seen by British Airways and its counsel; namely, Condon & Forsyth. British Airways therefore contends that since any and all information transferred to Condon & Forsyth was done with the understanding that it would be shared with British Airways, there is no possibility that Condon & Forsyth is in possession of information which the firm can use against it in this property damage action. That assertion is similarly not persuasive.

In his affidavit, Peter Doran, Law Intern responsible for communicating with defendant's many outside counsel, states that in his capacity as Law Intern he

> act[s] as the liaison between the Port Authority and its outside counsel and provide[s] these outside law firms with certified copies of Port Authority contracts, leases and other pertinent Port Authority documents and information, *including confidential and privileged Port Authority documents.*

Doran Aff'd, ¶ 2 (emphasis added). *See also* Def.'s Reply Mem. at 6 ("Further, as a matter of routine, the Port Authority provides both confidential and sensitive documents to Condon & Forsyth."). These confidential and sensitive documents include claim reports, contracts, leases, and maintenance records. Affidavit of James M. Begley, July 15, 1994 ("Begley Aff'd"), ¶ 14. *See also* Affidavit of Patrick Englese, Supervising Claims Representative for the Port Authority, July 15, 1994 ("Englese Aff'd"), ¶¶ 3, 7 (a "Confidential Report" regarding an accident is prepared and given to outside counsel representing the Port Authority). The Port Authority also supplies Condon & Forsyth with the names of potential witnesses. Begley Aff'd, ¶ 16.

The Port Authority, however, does not explain in its papers what information contained in these reports could be used to its disadvantage by British Airway in this federal property damage action. However, because we must analyze this motion pursuant to the more stringent "per se" test, the burden is not on the Port Authority to demonstrate that no confidential communications were delivered to Condon & Forsyth which may now be used against the Port Authority; rather, the burden is on British Airways to demonstrate that there will be no taint at trial and that there is no *"apparent* conflict in loyalties or diminution in the vigor of [its] representation." *Cinema 5,* 528 F.2d at 1387 (emphasis in original).

Furthermore, during oral argument, the Port Authority brought to the court's attention the fact that Condon & Forsyth has prepared and deposed Port Authority witnesses, such as maintenance personnel, in the personal injury actions and that these same persons may be deposed in this action as well. Information culled during the preparation of such witnesses could put British Airways at an unfair advantage provide an advantage to British Airways because this action also involves the extent to which the Port Authority properly maintained its property. Therefore, based on the information given to Condon & Forsyth—Doran Aff'd, ¶ 2, Begley Aff'd, ¶¶ 14, 16, the Englese Aff'd, and the preparation of witnesses— there may very well have been information delivered to Condon & Forsyth in the context of its joint defense of British Airways and the Port Authority in the personal injury actions, and its defense of the Port Authority in the other personal injury actions, which could now be used to the Port Authority's disadvantage in this case. The possibility of an unfair advantage for British Airways, and

---

9. Canon 4 provides that "[a] lawyer should preserve the confidences and secrets of a client."

the obvious "apparent" conflict in loyalties (Condon & Forsyth is, after all, suing a current client), compel the conclusion that British Airways has not met its burden under the "per se" test articulated in *Cinema 5*.[10] Furthermore, had the Port Authority known that British Airways may one day commence an action for property damage due to alleged negligence on one of the taxiways, it may have been more circumspect in the documents and information delivered to that corporation through its common counsel, Condon & Forsyth.

In sum, although Condon & Forsyth represents the Port Authority in a series of unrelated personal injury actions, and although it came to represent the client through a lease agreement with a third party, the Port Authority is still the client of Condon & Forsyth and, as such, it is owed the undivided loyalty of Condon & Forsyth. Because the act of suing one's client is a dramatic form of *disloyalty*, disqualification is appropriate. *See Nabisco*, 117 F.R.D. at 46–47:

> Nabisco's entitlement to the undivided loyalty of [its attorney] has been abrogated. Since conflict is endemic to this situation, not even [the attorney's] good faith belief that it can adequately represent both of its clients is sufficient to overcome the apparent conflict that arises when a law firm finds itself with its feet in opposing camps.
>
> As is often the case with disqualification motions, there has been no showing of any intentional wrongdoing or venality on the part of [the attorney]. The court's decision i[n] this case is premised upon its belief that preservation of the undivided

loyalty which an attorney owes his client is of paramount importance.

So too in this case: the Port Authority's entitlement to Condon & Forsyth's undivided loyalty has been, perhaps innocently, abrogated, but because the undivided loyalty owed to a client is of paramount importance, disqualification is appropriate. Indeed, at' least one court has interpreted Rule 1.7 of the American Bar Association Model Rules of Professional Conduct,[11] as providing for disqualification when an attorney sues his or her current client on a totally unrelated matter regardless of the fact that the attorney whose disqualification is sought did not obtain any information from the client which could put him or her at a disadvantage in the current litigation. *Manoir–Electroalloys Corp. v. Amalloy Corp.*, 711 F.Supp. 188, 195 (D.N.J.1989) (where attorney represents third-party defendant in preparing wills and giving tax advice, attorney is disqualified from suing that party for conspiracy to commit fraud in connection with the sale of a foundry; "[b]ecause the interest sought to be protected by Model Rule 1.7 is one of loyalty, a *per se* rule of disqualification should be applied when that rule is breached."). *See also International Business Machines Corp. v. Levin*, 579 F.2d 271, 280 (3d Cir.1978) (where attorney represents both the plaintiff in antitrust action and the defendant in unrelated labor matters, disqualification is appropriate because, in part, "[w]e think ... that it is likely that some 'adverse effect' on an attorney's exercise of his independent judgment on behalf of a client may result from the attorney's adversary posture toward that client in another legal matter.") (citing *Cine-*

---

**10.** British Airways also relies on *Aerojet Properties, Inc. v. State of New York*, 138 A.D.2d 39, 530 N.Y.S.2d 624 (3d Dep't 1988), for the proposition that, in this case, it has met its burden under the "per se" test. The case is distinguishable. In *Aerojet* the attorney whose disqualification was sought represented a claimant in the Court of Claims and, at the same time, represented the State of New York in a personal injury action. Applying the "per se" or "prima facie" test from *Cinema 5*, the court declined to disqualify the attorney because, in part, "there is absolutely no substantive nexus between the two lawsuits[,] [n]or is there any real potential for the disclosure of confidential information, notwithstanding [the State's] involvement in each lawsuit." *Id.* at 41, 530 N.Y.S.2d at 625. As noted above, there is a

potential for the disclosure of confidential information in this action. *See* Doran Aff'd, ¶ 2.

**11.** This rule provides that, "[a] lawyer shall not represent a client if the representation of that client will be directly adverse to another client; unless (1) the lawyer reasonably believes the representation will not adversely affect the relationship with another client; and (2) each client consents after consultation." The Second Circuit looks to both the American Bar Association Code of Professional Responsibility and its Model Rules of Professional Conduct in evaluating the ethical obligations of attorneys in this circuit. *See Pierce v. F.R. Tripler & Co.*, 955 F.2d 820, 828 (2d Cir.1992).

*ma 5* ). This conclusion is buttressed by the fact that there is, at the very least, the potential that the Port Authority could be at a disadvantage due to the information given to Condon & Forsyth in connection with the personal injury actions. Finally, even if the court had any doubts as to the appropriateness of disqualification, all such doubts must be resolved in favor of disqualification. *Cheng v. GAF Corp.*, 631 F.2d 1052, 1059 (2d Cir.1980), *vacated on other grounds and remanded*, 450 U.S. 903, 101 S.Ct. 1338, 67 L.Ed.2d 327 (1981).

## IV. *Waiver, Implied Consent and Laches*

As noted above, British Airways argues in the alternative that disqualification is inappropriate in this case because—even if there is an impermissible conflict of interest in a lawyer suing his own client on an unrelated matter without his consent—this court should conclude from the Port Authority's two year silence on the issue that the Port Authority either impliedly consented to British Airway's choice of counsel or waived its right to object due to the common law doctrine of laches.

### A. *Waiver and Implied Consent*

■ As the Third Circuit made clear in *Levin, supra,* the Code of Professional Responsibility places the burden on the client's attorney to fully inform and obtain from the client his or her consent before beginning or continuing with a cause of action against that client. In *Levin,* the plaintiff asserted, as in this case, that disclosure and consent were not necessary because the defendant had constructive knowledge of the pertinent facts and knew that the plaintiff's attorneys had worked for the defendant in certain matters. The court responded:

> This assertion is without merit. Clause (C) of DR 5–105 specifically imposes upon an attorney the burden of affirmatively providing disclosure and obtaining consent. Clearly, full and effective disclosure of all the relevant facts must be made and brought home to the prospective client.

The facts required to be disclosed are peculiarly within the knowledge of the attorney bearing the burden of making the disclosure. To accept [the attorney's] position would be to engraft an unwarranted exception on the requirement of DR 5–105 that disclosure must be sufficient to enable the prospective client himself to make an informed decision as to whether in the circumstances counsel will be retained.

*Levin,* 579 F.2d at 282 (footnote omitted). *See also Amalloy Corp.,* 711 F.Supp. at 195 (court rejects argument that party seeking disqualification "may be presumed to have been on notice as to the concurrent representation and, therefore, obligated to come forward if an objection existed" even though moving party had informed the attorney whose disqualification was sought that he had a relationship with it).

In this case, Condon & Forsyth did not meet its burden of providing the Port Authority with the full disclosure mandated by the Code of Professional Responsibility. Indeed, there was *no* attempt at disclosure and consent in this case.[12] In *Rossworm v. Pittsburgh Corning Corp.,* 468 F.Supp. 168 (N.D.N.Y.1979), relied upon by British Airways, the court determined that the moving party had given its implied consent to the continued representation by the attorney whose disqualification was sought, but there, unlike here, the nonmoving party wrote to the moving party and notified him that the attorney whose disqualification was sought had become a partner in the plaintiff lawyer's firm. *Id.* at 175.

In other cases cited by British Airways for the proposition that the Port Authority has given its implied consent to Condon & Forsyth's representation of British Airways, the moving party received information necessary for it to make an informed decision. *See, e.g., Trust Corp. of Montana v. Piper Aircraft Corp.,* 701 F.2d 85 (9th Cir.1983) (disqualification motion denied where moving party had learned from the attorney whose disqualification was sought of possible conflict two years and six months prior to filing

---

**12.** At oral argument, counsel from Condon & Forsyth explained that, based on the fact that the issue of a conflict had never been raised previ-ously, it "never occurred to [him]" to raise the issue with the Port Authority.

disqualification motion). In other cases, the actions of the moving party clearly established waiver and implied consent. *See, e.g., Central Milk Producers Co-op v. Sentry Food Stores, Inc.,* 573 F.2d 988 (8th Cir.1978) (court finds that moving party waived its right to bring disqualification motion when it had previously endorsed the nonmoving party's arrangement for screening matters from two former government attorneys who had worked on matters involving the moving party). Neither of these situations is present here: Condon & Forsyth did not inform the Port Authority of the potential conflict and the Port Authority affirmatively informed the firm that it would *not* consent to the firm's continued representation of British Airways.

■ And in still other cases relied upon by British Airways, the moving party waited until the eve of trial and could not adequately explain why it had waited so long in bringing its motion, *e.g., Redd v. Shell Oil Co.,* 518 F.2d 311, 315 (10th Cir.1975), and hence the court concluded that the moving party was engaging in impermissible trial tactics. Where there is inordinate and inadequately explained delay, a finding of a waiver or implied consent may be appropriate. *Lewis v. Unigard Mut. Ins. Co.,* 83 A.D.2d 919, 919, 442 N.Y.S.2d 522, 523 (1st Dep't 1981) (where party seeking disqualification had knowledge of conflict for six years and waited two years after filing of complaint to bring disqualification motion, motion is denied because of the "inordinate and inadequately explained delay"); *Young v. Oak Crest Park, Inc.,* 75 A.D.2d 956, 428 N.Y.S.2d 69 (3d Dep't 1980) (four year delay between filing action and seeking disqualification, without any explanation for delay, requires that disqualification motion be denied). In this case, however, the Port Authority has not waited until the eve of trial and it explains that the delay in discovering the conflict and in moving forward with its position is due, in part, to the World Trade Center bombing which occurred on February 26, 1993. Begley Aff'd, ¶ 26. A finding of waiver or implied consent, in this case, would therefore be inappropriate.

B. *Laches*

■ As the court in *Baird v. Hilton Hotel Corp.,* 771 F.Supp. 24 (E.D.N.Y.1991) noted, "[i]n this circuit, laches is generally not a defense to a motion to disqualify." *Id.* at 28. In *Baird,* the party seeking disqualification became aware of the conflict in November of 1989 and did not bring an order to show cause seeking disqualification of plaintiff's counsel until the eve of trial, thirteen months later. The court rejected the plaintiff's defense of laches: "In this case, the public interest in avoiding the appearance of impropriety in such situations ... is sufficient to preclude the application of laches to bar defendants' motion." *Id.* (citations omitted). The court also noted that the application of the laches doctrine might be appropriate in an extraordinary case where it is clear that the disqualification was inspired by dilatory tactics. *Id.* (citing *United States v. Newman,* 534 F.Supp. 1113, 1127 (S.D.N.Y.1982), *aff'd,* 722 F.2d 729 (2d Cir.), *cert. denied,* 464 U.S. 863, 104 S.Ct. 193, 78 L.Ed.2d 170 (1983)).

Applying these principles to this action, British Airways has failed to demonstrate that the Port Authority's motion is nothing more than a dilatory tactic on its part. As noted above, the motion does not come on the eve of trial, the moving party's delay was caused, in part, by the World Trade Center bombing, and although some discovery has been completed, it is not so far along that British Airways would be unfairly prejudiced if it had to obtain new counsel. Finally, as the Second Circuit stated in *Emle Industries, Inc. v. Patentex, Inc.,* 478 F.2d 562, 574 (2d Cir.1973), "the Court's duty and power to regulate the conduct of attorneys practicing before it, in accordance with the Canons, cannot be defeated by the laches of a private party or complainant." In *Emle,* the court rejected the nonmoving party's defense of laches even though the moving party had learned of the conflict three years before bringing its motion to disqualify. The court stated that a three-year delay is not "extraordinary." *Id.* In this case, the Port Authority's delay was only two years.

## CONCLUSION

For the foregoing reasons, defendant's motion to disqualify the firm of Condon & For-

syth from representing plaintiff in this action is granted.

SO ORDERED.